*PRELIMINARY PRINT*

VOLUME 605 U. S. PART 1

PAGES 1–37

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

APRIL 29, 2025

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published. Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# CASES ADJUDGED

IN THE

# SUPREME COURT OF THE UNITED STATES

AT

OCTOBER TERM, 2024

---

## ADVOCATE CHRIST MEDICAL CENTER ET AL. *v.* KENNEDY, SECRETARY OF HEALTH AND HUMAN SERVICES

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 23–715.   Argued November 5, 2024—Decided April 29, 2025

Page Proof Pending Publication

When hospitals provide inpatient services to Medicare beneficiaries, the Medicare program pays those hospitals a fixed rate for treating each Medicare patient.   See 42 U. S. C. §§ 1395ww(d)(1)–(4).   Congress also provides various hospital-specific rate adjustments, including the "disproportionate share hospital" (DSH) adjustment, which offers additional funding to hospitals that treat a high percentage of low-income patients.   To calculate the DSH adjustment, the Department of Health and Human Services (HHS) adds together two statutorily prescribed fractions referred to as the Medicare fraction and the Medicaid fraction.   § 1395ww(d)(5)(F)(vi).   The Medicare fraction "represents the proportion of a hospital's Medicare patients who have low incomes," and the Medicaid fraction "represents the proportion of a hospital's patients who are not entitled to Medicare and have low incomes."   *Becerra* v. *Empire Health Foundation, for Valley Hospital Medical Center*, 597 U. S. 424, 429–430. When the Medicare fraction is expressed as a percentage and added to the Medicaid fraction's percentage, the sum yields the disproportionate patient percentage.   § 1395ww(d)(5)(F)(vi).   That percentage, in turn, determines whether a hospital will receive a DSH adjustment—and if so, how much.

1

Relevant here, the numerator of the Medicare fraction is defined by the statute as "the number of [a] hospital's patient days" attributable to patients "who (for such days) were entitled to benefits under [Medicare] part A" and "entitled to supplementary security income [SSI] benefits . . . under subchapter XVI." § 1395ww(d)(5)(F)(vi)(I). This Court in *Empire Health* has held that the phrase "'entitled to [Medicare Part A] benefits'" in the Medicare fraction includes "all those qualifying for the program, regardless of whether they are receiving Medicare payments for part or all of a hospital stay." 597 U. S., at 445 (quoting § 1395ww (d)(5)(F)(vi)(I); alteration in original). But the Court has not addressed the issue presented in this case—*i. e.*, which patients count as being "entitled to [SSI] benefits . . . under subchapter XVI." HHS interprets the language to mean patients who are entitled to receive an SSI payment during the month in which they were hospitalized. Petitioners— a group of more than 200 hospitals—insist that the phrase includes all patients enrolled in the SSI system at the time of their hospitalization, even if they were not entitled to an SSI payment during their month of hospitalization. The hospitals claim that, as a result of HHS's misinterpretation of the phrase, HHS miscalculated the hospitals' DSH adjustment and underfunded the hospitals from 2006 to 2009. The hospitals have lost at every stage of this litigation, including most recently before the D. C. Circuit. The D. C. Circuit concluded that SSI benefits in "subchapter XVI [are] about cash payments for needy individuals," and that "it makes little sense to say that individuals are 'entitled' to the benefit in months when they are not even eligible for [a payment]." *Advocate Christ Medical Center* v. *Becerra*, 80 F. 4th 346, 352–353. The Court granted certiorari.

*Held*: In calculating the Medicare fraction, an individual is "entitled to [SSI] benefits" for purposes of the Medicare fraction when she is eligible to receive an SSI cash payment during the month of her hospitalization. Pp. 10–20.

    (a) SSI benefits are cash benefits. See 42 U. S. C. ch. 7, subch. XVI. Section 1381a, which describes the basic entitlement to benefits, provides that "[e]very . . . individual who is determined . . . to be eligible on the basis of his income and resources shall . . . be *paid* benefits." (Emphasis added.) The word "paid" connotes cash. Section 1382(b)(1), which specifies the amount that the Social Security Administration must pay to eligible individuals, states that the benefits "shall be payable at the rate of [specific dollar amounts]." A benefit quantified in dollar amounts is plainly a cash benefit. Similarly, subchapter XVI's codified statement of purpose is "to provide supplemental security *income* to individuals." § 1381 (emphasis added).

Syllabus

Just as subchapter XVI makes clear that SSI benefits are cash bene-
fits, it also establishes that eligibility for such benefits is determined
on a monthly basis. Section 1382(c)(1) provides that "[a]n individual's
eligibility for a benefit under this subchapter for a month shall be deter-
mined" based on the individual's "income, resources, and other relevant
characteristics in such month." The statute's reference to termination
of benefits also refers back to months of ineligibility, stating that an
individual must reapply for the program after she has been "ineligible
for benefits . . . for a period of 12 consecutive months." § 1383(j)(1)(B).

Finally, although subchapter XVI speaks primarily in terms of *eligi-
bility* for SSI benefits, the Medicare fraction focuses on whether an
individual is *entitled* to such benefits. Nothing turns on this difference.
In *Empire Health*, the Court treated the word "entitled" in the Medi-
care statute as synonymous with "qualifying" for or "being eligible . . .
for benefits." 597 U. S., at 435. This case also involves the Medicare
fraction, so the Court follows the same course. Because eligibility for
an SSI payment is determined on a monthly basis, an individual is con-
sidered "entitled to [SSI] benefits" for purposes of the Medicare fraction
when she is eligible for such benefits during the month of her hospital-
ization. Pp. 10–12.

(b) The hospitals' broader reading of "entitled to [SSI] benefits" fails.
Pp. 12–20.

(1) While the hospitals characterize SSI benefits as including non-
cash benefits—*e. g.,* vocational rehabilitation services and continued
Medicaid coverage—these noncash benefits do not fit the description
of a "supplementa[l] security *income*" benefit. § 1395ww(d)(5)(F)(vi)(I)
(emphasis added). Further, none of the noncash benefits identified by
the hospitals is housed "*under subchapter XVI.*" *Ibid.* (empha-
sis added). The hospitals' reliance on the Ticket to Work and Self-
Sufficiency Program falls short for this reason. Nor do any of subchap-
ter XVI's other references to vocational rehabilitation services confer
an SSI benefit. Rather, § 1382d's references to certain services point
to benefits housed elsewhere, but not within subchapter XVI.

The hospitals' reliance on continued Medicaid coverage pursuant to
§ 1382h(b) also falls flat. In most States, eligibility for SSI benefits
qualifies an individual for Medicaid coverage. While losing SSI benefits
generally means losing Medicaid coverage, § 1382h(b) allows certain peo-
ple ineligible for SSI benefits in a given month to be treated as if they
remain eligible for SSI benefits so that they can continue receiving Med-
icaid. But § 1382h(b), which by its terms applies only to Medicaid (*i. e.,*
"subchapter XIX"), simply aids in the administration of the Medicaid
program. It does not create an SSI benefit. Pp. 13–15.

Page Proof Pending Publication

(2) The hospitals advance a second argument that eligibility for SSI benefits—even for purely cash benefits—begins when a person enters the SSI system and continues until the individual is ineligible for an SSI payment for 12 consecutive months. While it is true that a person first applying for benefits must disclose her income "rate" "for the calendar year," §1382(a)(1)(A), that "calendar year" income does not render her eligible for SSI benefits, nor does it establish that SSI benefits operate in intervals with a duration longer than one month. Instead, the statute clearly directs eligibility decisions to be made monthly based on "the individual's . . . income, resources, and other relevant characteristics *in such month*." §1382(c) (emphasis added). Nor does the reapplication requirement change the nature of eligibility. Under §1383(j)(1)(B), a once-eligible individual must submit a new application after she has been "ineligible for benefits . . . for a period of 12 consecutive months." That provision does not state that a person remains eligible during this period; it states that a person who "*was* an eligible individual" at one point must reapply after 12 consecutive months of ineligibility. §1383(j)(1)(A) (emphasis added).

The hospitals also assert that *Empire Health* supports their theory that being "entitled to [SSI] benefits" means that a patient is entitled to SSI benefits even if she does not qualify for a payment during the month of hospitalization. Not so. Just as *Empire Health* turned on the specific features of Medicare Part A, this case turns on the specific features of SSI benefits under subchapter XVI. Unlike Medicare Part A, which provides automatic, ongoing health insurance that "never goes away" absent diminished disability, *Empire Health*, 597 U. S., at 437, SSI benefits require recipients to apply for and be deemed eligible for benefits, and recipients can (and do) fluctuate in and out of eligibility based on monthly income and resources. Consistency with *Empire Health*'s benefit-focused analysis thus requires the Court to recognize and give effect to the differences between Medicare Part A and SSI benefits. Pp. 15–18.

(3) Finally, invoking statutory purpose, the hospitals argue that their broad reading of "entitled to [SSI] benefits" better advances Congress's goal of providing additional funds to hospitals that serve a disproportionately high percentage of needy Medicare patients. But "[n]o statute pursues a single policy at all costs," *Bartenwerfer* v. *Buckley*, 598 U. S. 69, 81, and the Court must respect the specific formula that Congress prescribed. Pp. 18–20.

80 F. 4th 346, affirmed.

BARRETT, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, KAGAN, GORSUCH, and KAVANAUGH, JJ., joined.

Opinion of the Court

JACKSON, J., filed a dissenting opinion, in which SOTOMAYOR, J., joined, *post*, p. 20.

*Melissa Arbus Sherry* argued the cause for petitioners. With her on the briefs were *Hyland Hunt*, *Ruthanne M. Deutsch*, *Daniel F. Miller*, *Sara J. MacCarthy*, *Heather D. Mogden*, *Eric J. Konopka*, *Jordan R. Goldberg*, and *Maureen O'Brien Griffin*.

*Ephraim A. McDowell* argued the cause for respondent. With him on the brief were *Solicitor General Prelogar*, *Principal Deputy Assistant Attorney General Boynton*, *Deputy Solicitor General Kneedler*, *Mark B. Stern*, and *Stephanie R. Marcus*.*

JUSTICE BARRETT delivered the opinion of the Court.

The Medicare program, which provides health insurance to elderly or disabled Americans, is governed by a notoriously complex statute. Unsurprisingly, then, the provision at issue in this case is highly technical: It prescribes a percentage used to calculate the rate that the Government will pay a hospital that treats a disproportionate share of low-income Medicare patients. The percentage is determined by the sum of two fractions—the so-called Medicare fraction and Medicaid fraction. Relevant here, the numerator of the Medicare fraction counts the number of patient days attributable to Medicare patients who were "entitled to benefits under [Medicare] part A" and were "entitled to supplementary security income benefits . . . under subchapter XVI." 42 U. S. C. §1395ww(d)(5)(F)(vi)(I).

In *Becerra* v. *Empire Health Foundation, for Valley Hospital Medical Center*, we held that the phrase "'entitled to

_____

*Briefs of *amici curiae* urging reversal were filed for the American Hospital Association et al. by *Morgan L. Ratner*; and for Twenty-Six State and Regional Hospital Associations by *Robert L. Roth*, *Kelly A. Carroll*, *Sven C. Collins*, and *Lloyd A. Bookman*.

*Alan J. Sedley* filed a brief for the Empire Health Foundation as *amicus curiae*.

[Medicare Part A] benefits'" includes "all those qualifying for the program, regardless of whether they are receiving Medicare payments for part or all of a hospital stay." 597 U. S. 424, 445 (2022) (quoting §1395ww(d)(5)(F)(vi)(I); alteration in original). We did not decide, however, what it means to be "entitled to supplementary security income benefits . . . under subchapter XVI." §1395ww(d)(5)(F)(vi)(I). Today, we hold that a person is entitled to such benefits when she is eligible to receive a cash payment during the month of her hospitalization.

I

The Medicare program reimburses hospitals that provide inpatient services to Medicare beneficiaries. See §1395ww(d). As a rule, the "program pays a hospital a fixed rate for treating each Medicare patient, based on the patient's diagnosis," which is "designed to reflect the amounts an efficiently run hospital, in the same region, would expend to treat a patient with the same diagnosis." *Id.*, at 429 (citing §§1395ww(d)(1)–(4) and 42 CFR §412.2 (2022)). Because the fixed-rate payment is provided "regardless of the hospital's actual costs," it "gives hospitals an incentive to provide efficient levels of medical service." *Empire Health*, 597 U. S., at 429.

Congress also "provided for various hospital-specific rate adjustments—including the one at issue here for treating low-income patients." *Ibid.* That adjustment is called the "disproportionate share hospital" (DSH) adjustment, which provides "hospitals serving an 'unusually high percentage of low-income patients' enhanced Medicare payments." *Ibid.* (quoting *Sebelius* v. *Auburn Regional Medical Center*, 568 U. S. 145, 150 (2013)). This adjustment accounts for the fact that "low-income individuals are often more expensive to treat than higher income ones, even for the same medical conditions." *Empire Health*, 597 U. S., at 429. The enhanced payment incentivizes hospitals to treat low-income patients. See *ibid.*

In *Empire Health*, we described the DSH adjustment in great detail, so here, we will be brief.   To calculate a hospital's DSH adjustment, the Department of Health and Human Services (HHS) adds together "two statutorily described fractions, usually called the Medicare fraction and the Medicaid fraction."   *Ibid.*; see § 1395ww(d)(5)(F)(vi).   Together, these fractions are "designed to capture two different low-income populations that a hospital serves."   *Id.*, at 429. The "*Medicare* fraction represents the proportion of a hospital's Medicare patients who have low incomes, as identified by their entitlement to supplementary security income (SSI) benefits."   *Id.*, at 429–430.   And "[t]he *Medicaid* fraction represents the proportion of a hospital's patients who are not entitled to Medicare and have low incomes, as identified by their eligibility for Medicaid."   *Id.*, at 430.

Like *Empire Health*, this case concerns the Medicare fraction, which is defined as:

> "the fraction (expressed as a percentage), the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under part A of this subchapter and were entitled to supplementary security income benefits (excluding any State supplementation) under subchapter XVI of this chapter, and the denominator of which is the number of such hospital's patient days for such fiscal year which were made up of patients who (for such days) were entitled to benefits under part A of this subchapter."   § 1395ww(d)(5)(F)(vi)(I).[1]

In plainer English, the Medicare fraction works like this: The numerator counts "the number of patient days attribut-

---

[1] Although the Medicare fraction employs the phrase "*supplementary* security income," § 1395ww(d)(5)(F)(vi)(I) (emphasis added), subchapter XVI refers to this benefit as "*supplemental* security income," § 1381 (emphasis added).   Despite the slight variation in wording, these two phrases refer to the same benefit.

able to Medicare patients who are poor"—*i. e.*, those Medicare patients who are entitled to SSI benefits under subchapter XVI. *Id.*, at 430. The denominator counts "the number of patient days attributable to all Medicare patients." *Ibid.* When the Medicare fraction is expressed as a percentage and added to the Medicaid fraction's percentage, the sum of the two yields the "'disproportionate patient percentage.'" § 1395ww(d)(5)(F)(vi). The resulting percentage "determines whether a hospital will receive a DSH adjustment"— and if so, how much. *Id.*, at 431. "The higher the disproportionate-patient percentage," the more funding a hospital receives. *Id.*, at 432 (citing §§ 1395ww(d)(5)(F)(vii)–(xiv)).

For purposes of this case, the key phrase in the Medicare fraction is "entitled to supplementary security income benefits . . . under subchapter XVI." § 1395ww(d)(5)(F)(vi)(I). Supplemental security income is "a subsistence allowance" offered to the country's "needy aged, blind, and disabled." *Schweiker* v. *Wilson*, 450 U. S. 221, 223 (1981); see also § 1381 (describing subchapter XVI as a "national program to provide supplemental security income to individuals who have attained age 65 or are blind or disabled"). HHS interprets the relevant text to refer to patients who are "entitled to receive SSI benefits during the month" in which they were hospitalized. 75 Fed. Reg. 50281 (2010).[2]

---

[2] To calculate the number of people eligible for SSI benefits in a particular month, HHS obtains data from the Social Security Administration (SSA) that seeks to "captur[e] all SSI-entitled individuals during the month(s) that they are entitled to receive SSI benefits." 75 Fed. Reg. 50281. SSA collects this data by identifying certain "status codes" that indicate whether a person was entitled to SSI benefits during a particular month. *Ibid.* As part of a 2010 rulemaking, HHS evaluated various codes used by SSA and concluded that three codes (C01, M01, and M02) capture the relevant population of those entitled to a monthly SSI cash benefit. *Ibid.* Code C01 represents SSI enrollees who receive an automatic cash payment, and codes M01 and M02 represent SSI enrollees whose cash payments are managed manually. See *Advocate Christ Medi-*

Cite as: 605 U. S. 1 (2025)

Opinion of the Court

Petitioners, a group of more than 200 hospitals, disagree with this interpretation. They insist that the phrase encompasses all patients enrolled in the SSI system at the time of their hospitalizations, even if those patients were not entitled to an SSI payment during that month. This approach sweeps more people into the numerator of the Medicare fraction, thereby increasing the amount of funding a hospital may receive. See §§ 1395ww(d)(5)(F)(vii)–(xiv). The hospitals claim that because HHS misconstrued the Medicare fraction, it underfunded them during the fiscal years 2006 to 2009.

The hospitals have lost at every step of this litigation. The Provider Reimbursement Review Board, a tribunal within HHS, denied the hospitals' request for additional reimbursement on procedural grounds. The Centers for Medicare & Medicaid Services, which administers Medicare for HHS, also denied relief, this time on the merits. The hospitals then sought review in the District Court, which rejected their claims and granted summary judgment to HHS. See *Advocate Christ Medical Center* v. *Azar*, No. 17–cv–1519 (D DC, June 8, 2022), App. to Pet. for Cert. 18. The

_cal Center_ v. _Becerra_, 80 F. 4th 346, 350, n. 1 (CADC 2023). As part of that rulemaking, HHS rejected a proposal to begin using additional SSA codes that, according to the commenter, "represent individuals who [are] eligible for SSI, but not eligible for SSI payments" in a given month, including because the individual is in "suspended" status. 75 Fed. Reg. 50280–50281; see 20 CFR §§ 416.1320–416.1330, 416.1339 (2024) (describing suspension of benefits payments). In rejecting this proposal, HHS explained that "none of the SSI status codes . . . mentioned would be used to describe an individual who was entitled to receive SSI benefits during the month that one of those status codes was used." 75 Fed. Reg. 50281.

This case does not present the question whether HHS correctly includes only three SSI status codes as part of its calculation for the Medicare fraction. Below, the D. C. Circuit declined to consider whether HHS "unreasonably excluded from the Medicare fraction individuals assigned codes 'S' and 'E02'" because the hospitals raised the argument for the first time in their reply brief. 80 F. 4th, at 354. We too decline to consider this issue.

D. C. Circuit also agreed with HHS.  See *Advocate Christ Medical Center* v. *Becerra*, 80 F. 4th 346 (2023).  In explaining that SSI benefits in "subchapter XVI [are] about cash payments for needy individuals," the D. C. Circuit observed that "it makes little sense to say that individuals are 'entitled' to the benefit in months when they are not even eligible for [a payment]."  *Id.*, at 352–353.  We granted certiorari. 602 U. S. 1021 (2024).

## II

To determine when a person is "entitled to supplementary security income benefits," §1395ww(d)(5)(F)(vi)(I), we must know what the benefits are.  See *Empire Health*, 597 U. S., at 435–439.  The answer is clear: SSI benefits are cash benefits.  See 42 U. S. C. ch. 7, subch. XVI.  Section 1381a, which describes the basic entitlement to benefits, provides that "[e]very . . . individual who is determined . . . to be eligible on the basis of his income and resources shall . . . be *paid* benefits by the Commissioner."  (Emphasis added.) The word "paid" obviously connotes a cash benefit.  Section 1382(b) sings the same tune: It specifies the amount that SSA is required to pay eligible individuals, stating that "[t]he benefit under this subchapter . . . shall be payable at the rate of [specific dollar amounts]."  §1382(b)(1).  A benefit quantified in dollar amounts is plainly a cash benefit.  Echoing the point, other provisions explain how and when the cash benefit is to be paid to recipients.  See, *e. g.*, §1383 (prescribing procedures for the "payment of benefits" (boldface deleted)); §1383(a)(4)(A) (permitting a "cash advance against such benefits" to individuals in limited circumstances).[3]  Subchapter XVI's codified statement of purpose is of a piece: to "estab-

---

[3] See also §1382(h) (describing rules for "determining eligibility for, and the amount of, benefits payable" to individuals who receive other types of financial assistance); §1382f(a) (providing an "[i]ncrease of dollar amounts" of SSI benefits based on cost-of-living adjustments (boldface deleted)); §1383(b)(1)(A) (providing "appropriate adjustments in future payments" in the case of overpayments or underpayments of SSI benefits).

lis[h] a national program to provide supplemental security *income* to individuals who have attained age 65 or are blind or disabled." §1381 (emphasis added). "Income" is "a gain or recurrent benefit that is usu[ally] measured in money and for a given period of time." 2 Webster's Third New International Dictionary 1143 (1971).

Statutory provisions outside subchapter XVI also understand the phrase "[SSI] benefits . . . under subchapter XVI" to mean a cash benefit. Take §1320b–19 in subchapter XI, which directs the Commissioner of Social Security to establish the Ticket to Work and Self-Sufficiency Program. Section 1320b–19 defines the phrase "supplemental security income benefit" to mean "a cash benefit under section 1382 or 1382h(a) of this title." §1320b–19(k)(5); see also §1320a–6(b) (defining the term "supplemental security income benefits" to "mea[n] benefits paid or payable by the Commissioner of Social Security under subchapter XVI"). Same too in subchapter VIII, which provides special benefits for certain World War II veterans. There, Congress defined the "'[f]ederal benefit rate under subchapter XVI'" to mean "with respect to any month, the amount of the supplemental security income cash benefit." §1012(4).

Just as subchapter XVI makes clear that SSI benefits are cash benefits, it also establishes that eligibility for such benefits is determined on a monthly basis. Section 1382(c)(1) provides that "[a]n individual's eligibility for a benefit under this subchapter for a month shall be determined" based on the individual's "income, resources, and other relevant characteristics in such month." The statute's reference to termination of benefits also refers back to months of ineligibility: An individual must reapply for the program after she has been "ineligible for benefits . . . for a period of 12 consecutive months." §1383(j)(1)(B). Other examples similarly confirm that eligibility is a month-to-month inquiry. See, *e. g.*, §1382(e)(1)(A) (providing that "no person shall be an eligible individual . . . with respect to any month if throughout such

month he is an inmate of a public institution"); § 1382(e)(1)(D) (providing that "[a] person may be an eligible individual . . . with respect to any month throughout which he is a resident of a public emergency shelter for the homeless"); §§ 1382(e) (4)(A)(i)–(ii) (providing that "[n]o person shall be considered an eligible individual . . . with respect to any month if during such month the person is . . . fleeing to avoid prosecution" or violating "a condition of probation or parole").

A note for the sake of completeness: While subchapter XVI speaks primarily in terms of *eligibility* for SSI benefits, the Medicare fraction focuses on whether an individual is *entitled* to such benefits. Nothing turns on this difference. In *Empire Health*, we treated the word "entitled" in the Medicare statute (including the Medicare fraction) as synonymous with "qualifying" for or "being eligible . . . for benefits." 597 U. S., at 435. See also Webster's Third New International Dictionary 758 (1986) (defining "entitle" as "to give a right or legal title to" or to "qualify (one) for something"); *id.*, at 736 (defining "eligible" as "fitted or qualified to be chosen or used" or "entitled to something"). This case also involves the Medicare fraction, so we follow the same course. See *Brown* v. *Gardner*, 513 U. S. 115, 118 (1994) (noting that the presumption of consistent usage is "surely at its most vigorous when a term is repeated within a given sentence").

We therefore conclude that an individual is "entitled to [SSI] benefits . . . under subchapter XVI" when she is eligible to receive an SSI cash payment. And because eligibility is determined on a monthly basis, an individual is considered "entitled to [SSI] benefits" for purposes of the Medicare fraction only if she is eligible for such benefits during the month of her hospitalization.

## III

The hospitals advance two primary arguments for reading the phrase "entitled to [SSI] benefits . . . under subchapter XVI" more broadly. First, they characterize SSI benefits

as encompassing noncash benefits for which eligibility is not determined on a monthly basis. Second, the hospitals, joined by the dissent, argue that eligibility for SSI benefits persists until a person must reapply for them, which occurs after 12 consecutive months of ineligibility for a cash payment. See § 1383(j)(1)(B).

## A

As the hospitals see it, SSI benefits include both cash *and* noncash benefits—specifically, vocational rehabilitation services and continued Medicaid coverage.[4] And a patient remains eligible for these benefits, the hospitals assert, even in months when the patient does not receive a cash payment.

The hospitals' theory stumbles out of the gate, because neither vocational rehabilitation services nor continued Medicaid coverage fits the description of a "supplementa[l] security *income*" benefit. § 1395ww(d)(5)(F)(vi)(I) (emphasis added). And even beyond that self-evident point, none of these benefits is housed *"under subchapter XVI." Ibid.* (emphasis added).

Begin with the hospitals' reliance on the Ticket to Work and Self-Sufficiency Program. This program, which is available to people eligible for SSI benefits based on disability or blindness, provides career development support and expanded employment opportunities through state agencies or private employment networks. See § 1320b–19. Because subchapter XI establishes the Ticket to Work program, it is not a benefit "under subchapter XVI." § 1395ww(d)(5) (F)(vi)(I).

Nor do any of subchapter XVI's other references to vocational rehabilitation services confer an SSI benefit. Section 1382d(a), for example, requires the Commissioner to refer blind or disabled minors who receive SSI monthly cash pay-

---

[4] In the court below, the hospitals pressed Medicare Part D's prescription drug subsidy as another noncash SSI benefit. Because the hospitals have abandoned their reliance on that program, we do not address it.

ments to the "appropriate State agency administering [a] State program under subchapter V" of the Social Security Act. The remainder of § 1382d authorizes SSA to "reimburse" state agencies that administer or supervise "vocational rehabilitation services approved under title I of the Rehabilitation Act of 1973." § 1382d(d). These express cross-references to subchapter V of the Social Security Act and title I of the Rehabilitation Act point to benefits housed elsewhere—not within subchapter XVI.

The hospitals' reliance on continued Medicaid coverage also fails. In most States, eligibility for SSI benefits qualifies an individual for Medicaid health coverage. See § 1396a(a)(10)(A)(i)(II). Thus, if a person earns excess income and loses her eligibility for SSI payments, she generally also loses access to Medicaid. See *ibid.*; *Baystate Medical Center* v. *Leavitt*, 545 F. Supp. 2d 20, 37, n. 24 (DC 2008). Section 1382h(b) creates a limited exception to that default rule. It provides that "for purposes of subchapter XIX [governing Medicaid], any individual who was determined to be a blind or disabled individual eligible to receive [an SSI] benefit under section 1382" and "who in a subsequent month is ineligible for benefits under this subchapter" due to excess "income" is still "considered to be receiving [SSI] benefits." § 1382h(b). According to the hospitals, the benefit of continued Medicaid coverage "arises solely out of section 1382h(b)" and therefore counts as an SSI benefit. Brief for Petitioners 37.

The hospitals are mistaken. Section 1382h(b) does not create a supplemental security income benefit—it aids in the administration of the Medicaid program. (Hence the opening phrase of § 1382h(b) states that the provision is "for purposes of subchapter XIX," which governs Medicaid.) The provision merely allows certain blind or disabled people who are *not eligible* to receive SSI benefits in a given month to be treated *as if* they remain eligible for SSI benefits so that they can continue receiving Medicaid benefits. If continued

Medicaid coverage is an SSI benefit under subchapter XVI, this is a very odd way of establishing it. Under the hospitals' theory, this provision confers an SSI benefit on people it simultaneously describes as "ineligible for [SSI] benefits." § 1382h(b). That defies common sense.

B

The hospitals, joined by the dissent, advance a second argument: Eligibility, even for purely cash benefits, begins when a person enters the SSI system and continues until she has been ineligible for 12 consecutive months, at which point she must submit a new application for benefits. See *post*, at 26, 29–32 (opinion of JACKSON, J.).

To support this theory, the hospitals and the dissent emphasize that when a person first applies for benefits, she must disclose her income "rate" "for the calendar year." § 1382(a)(1)(A); see *post*, at 30. True enough. But her "calendar year" income does not render her eligible for SSI benefits, nor does it establish that SSI benefits operate in intervals with a duration longer than one month. For that, she must still show that she meets the requirements for a given month. In fact, a nearby provision of the statute directs eligibility determinations "for a month" to be made "on the basis of the individual's . . . income, resources, and other relevant characteristics *in such month*." § 1382(c) (emphasis added). And while the dissent looks to § 1383(a)(2)(B)(viii) for help, none is forthcoming. That the Commissioner may "defer (in the case of initial entitlement) or suspend (in the case of existing entitlement)" a payment of a benefit, § 1383(a)(2)(B)(viii), merely addresses a question of timing— it does not, as the dissent suggests, "contemplate a long-term benefits relationship," *post*, at 30.

Nor does the reapplication requirement change the nature of eligibility. Under § 1383(j)(1)(B), a once-eligible individual must submit a new application after she has been "ineligible for benefits . . . for a period of 12 consecutive months."

Note that this provision does *not* say that an individual remains eligible until this 12-month period has lapsed. On the contrary: It states that a person who "*was* an eligible individual" at one point must reapply after 12 consecutive months of *ineligibility.* § 1383(j)(1)(A) (emphasis added). As the D. C. Circuit observed, "it makes little sense to say that individuals are 'entitled' to the benefit in months when they are not even eligible for it." 80 F. 4th, at 353.[5]

Leaning on *Empire Health,* which dealt with Medicare Part A, the hospitals and the dissent urge us to think of SSI benefits as an "income-insurance program." Brief for Petitioners 41; see *post,* at 35. The shoe does not fit. Insurance programs generally "provid[e] basic protection against [certain future] costs," including, in the case of Medicare Part A, "the costs of hospital, related post-hospital, home health services, and hospice care." § 1395c (describing Medicare Part A as an "insurance program"). SSI benefits, by contrast, do not provide an ongoing backstop against unexpected costs—they operate as a welfare payment that directly subsidizes recipients' income. See *Schweiker,* 450 U. S., at 223 (describing SSI as "provid[ing] a subsistence allowance"); *Bowen* v. *Galbreath,* 485 U. S. 74, 75 (1988) (describing SSI as a "welfare program").

---

[5] Moreover, this provision appears to be a housekeeping measure: Added roughly 14 years after SSI benefits were established, it ties the reapplication process to SSA's longstanding practice of removing people from its database after 12 months of ineligibility. See 101 Stat. 3576; Tr. of Oral Arg. 60. Nor do other housekeeping provisions demonstrate that eligibility for SSI benefits is determined on something other than a monthly basis. See, *e. g.,* § 1383(e)(1)(B)(ii)(II)(bb) (ensuring SSA's access to benefit recipient's financial information until "the cessation of the recipient's eligibility for benefits under this subchapter"); § 1382c(a)(3)(H)(ii)(I) (requiring SSA to review, at least "once every 3 years," "the continued eligibility for benefits under this subchapter of each individual who has not attained 18 years of age and is eligible for such benefits by reason of an impairment . . . likely to improve").

Notwithstanding these differences, the hospitals and the dissent insist that consistency with *Empire Health* requires us to reject HHS's interpretation.   See Brief for Petitioners 19–21; *post*, at 33–36.   Recall that in *Empire Health*, we interpreted " 'entitled to [Medicare Part A] benefits' " to mean "all those qualifying for the program, regardless of whether they are receiving Medicare payments for part or all of a hospital stay."   597 U. S., at 445 (quoting § 1395ww(d)(5)(F)(vi)(I); alteration in original).   So too here, the hospitals and the dissent assert: Being "entitled to [SSI] benefits" means that a patient is entitled to SSI benefits even if she does not qualify for a payment during the month of hospitalization.[6]

Yet rather than supporting this interpretation, *Empire Health* cuts against it.   We defined the entitlement to benefits under Medicare Part A after carefully examining the prerequisites and characteristics of that particular benefit.   See *id.*, at 435–439.   Medicare Part A, we observed, provides automatic and ongoing health insurance to individuals over the age of 65 or who have a chronic disability.   *Id.*, at 435–436.   And we explained that the Medicare Part A entitlement "never goes away" unless a beneficiary's chronic "disability diminishes," and that "the stoppage of payment for any given service cannot be thought to affect the broader statutory entitlement to Part A benefits."   *Id.*, at 437.   For example, even if a patient "hit some limit on coverage" for eye care under Part A, the "policy [would] pay for more eye

---

[6] The dissent also criticizes our reading of the statute on the ground that it excludes from the Medicare fraction's numerator certain patients who fail to receive payment during their month of hospitalization due to reasons unrelated to income.   See *post*, at 28.   But Congress's decision to exclude certain individuals from eligibility for SSI benefits under subchapter XVI reflects that "the SSI program is broad in its reach, [but] its coverage is not complete."   *Schweiker* v. *Wilson*, 450 U. S. 221, 224 (1981).   And again, we take no position on whether HHS has unreasonably excluded particular codes from the Medicare fraction.

care in the next coverage period and meanwhile will pay for [a] knee replacement." *Ibid.*

Just as our decision in *Empire Health* turned on the specific features of Medicare Part A, this case turns on the specific features of SSI benefits under subchapter XVI. And a comparison of the two programs reveals critical distinctions. Again, while Medicare Part A benefits extend beyond specific payments for any given medical need, SSI benefits under subchapter XVI consist of monthly cash payments and nothing more. And while Medicare Part A's entitlement is automatic and ongoing (with the exception of a disability that diminishes), the SSI benefit is neither: Recipients must apply for and be deemed eligible for benefits, and recipients can (and do) fluctuate in and out of eligibility depending on their income and resources from one month to the next. Consistency with *Empire Health*'s benefit-focused analysis thus requires us to recognize and give effect to the differences between Medicare Part A and SSI benefits.

C

Finally, invoking statutory purpose, the hospitals and the dissent insist that their interpretation of "entitled to [SSI] benefits . . . under subchapter XVI" best accords with "Congress's ultimate goal [of] provid[ing] hospitals that serve the neediest among us with the appropriate level of critical funds." *Post*, at 21. (Indeed, the dissent frames its argument as one primarily about the statute's purpose and only secondarily about its text.) They regard our reading as inconsistent with the overall purpose of the Medicare fraction and DSH adjustment, because people who happen not to qualify for an SSI cash payment in a given month are unlikely to be any healthier or less costly to treat from one month to the next. As they see it, including these patients in the numerator of the Medicare fraction better measures a hospital's burden, ensuring that the hospital receives "the appropriate level of critical funds." *Ibid.*

This argument overlooks that Congress chose a specific means to advance its end of better funding hospitals that care for a disproportionate percentage of needy Medicare patients. It could have chosen another. For instance, it could have captured the number of poor Medicare patients by relying on proof of annual income. (That measure might increase the numerator and therefore the reimbursement rate.) Alternatively, it could have more precisely isolated the expensive-to-treat Medicare patients by using not only their annual incomes, but also their health histories. (That measure might decrease the numerator and therefore the reimbursement rate.) But instead of choosing one of these (or some other) option, Congress decided to approximate a hospital's share of expensive-to-treat Medicare patients by using the patient's entitlement to SSI benefits under subchapter XVI. That is not a perfect measure of income—but neither is income a perfect measure of whether a patient is more costly to treat. In the end, the Medicare fraction and ultimate DSH adjustment reflect a balance of multiple competing interests, including increased funding for hospitals, administrability, efficiency, and allocation of finite resources.

So yes, Congress sought to increase the reimbursement rate for hospitals that care for a disproportionate share of low-income Medicare patients. But as we have explained many times before, "[n]o statute pursues a single policy at all costs, and we are not free to rewrite this statute (or any other) as if it did." *Bartenwerfer* v. *Buckley*, 598 U. S. 69, 81 (2023); *Luna Perez* v. *Sturgis Public Schools*, 598 U. S. 142, 150 (2023) ("no law '"pursues its . . . purpose[s] at all costs"'" (alterations in original)); *American Express Co.* v. *Italian Colors Restaurant*, 570 U. S. 228, 234 (2013) (same); *Kucana* v. *Holder*, 558 U. S. 233, 252 (2010) (same); *Rodriguez* v. *United States*, 480 U. S. 522, 525–526 (1987) (*per curiam*) (same). We must determine *how* Congress chose to pursue its objective. *Henson* v. *Santander Consumer USA Inc.*, 582 U. S. 79, 89 (2017) ("Legislation is, after all, the art

of compromise, the limitations expressed in statutory terms often the price of passage"). And here, Congress made a specific choice: For purposes of the Medicare fraction, an individual is "entitled to [SSI] benefits" when she is eligible to receive an SSI cash payment during the month of her hospitalization. §1395ww(d)(5)(F)(vi)(I). We must respect the formula that Congress prescribed.

\*    \*    \*

For the foregoing reasons, we affirm the judgment of the Court of Appeals.

*It is so ordered.*

JUSTICE JACKSON, with whom JUSTICE SOTOMAYOR joins, dissenting.

Providing quality healthcare to low-income patients can be costly. When Congress established Medicare's hospital-reimbursement system, it recognized that people with low incomes tend to have comparatively worse health conditions and health outcomes than wealthier people, and was clear eyed about the fact that, as a result, "[h]ospitals that serve a disproportionate share of low-income patients have higher medicare costs." H. R. Rep. No. 99–241, pt. 1, p. 16 (1985). To account for the variable costs attributable to the health-care needs of different socioeconomic populations, Congress opted to reimburse hospitals that have a "disproportionate share" of low-income patients at a different (greater) rate than other hospitals.

This case concerns the formula that Congress uses to identify and compensate those hospitals. The majority and I are in considerable agreement about key aspects of the statutory provision at issue. We agree that the point of the "disproportionate share" Medicare formula is to identify hospitals that serve a disproportionate number of low-income patients. We agree that the formula looks to the Supplemental Security Income (SSI) program—a benefits program for low-

JACKSON, J., dissenting

income Americans that entitles certain individuals to receive cash payments from the Government—and counts the number of a hospital's Medicare-eligible patients who are also "entitled to" SSI. We agree that, under the SSI program, eligibility for a cash payment in a given month turns on a person's monthly income. And we agree that, if the SSI program operates like Medicare Part A, our decision in *Becerra* v. *Empire Health Foundation, for Valley Hospital Medical Center*, 597 U. S. 424 (2022), would control the outcome of this case, and would require us to rule for the hospitals.

All that said, the majority's interpretation of Medicare's disproportionate-share formula is based upon a fundamental misunderstanding of how SSI's cash-benefit program works. And that misunderstanding has led the majority to evaluate the Medicare statute without regard to the function of the formula's reference to the SSI program, causing it to reach the wrong conclusion.

To be specific: When Congress created Medicare's disproportionate-share formula, it looked to SSI's cash-benefits program *for a reason*. No one disputes that Congress's ultimate goal was to provide hospitals that serve the neediest among us with the appropriate level of critical funds. The only logical basis for the formula's reliance on SSI, then, is to draw from that program's pre-existing pool of individuals that have already been designated as our society's neediest—*not* to assess the wholly irrelevant fact of whether any such individual actually received a cash payment under the SSI program during the month of their hospitalization. The majority's interpretation both ignores this critical context and endorses an interpretation of the Medicare formula that arbitrarily undercounts a hospital's low-income patients.

In short, under the majority's reading, Congress's reference to the SSI scheme in the Medicare statute serves no rational purpose. Worse still, the majority seems to think

that a statutory formula specifically designed to authorize payments to certain hospitals in greater amounts is best read to affect the arbitrary denial of those additional funds.   Respectfully, I dissent.

I

"The Medicare program provides Government-funded health insurance to over 64 million elderly or disabled Americans."   *Empire Health*, 597 U. S., at 428.   The program generally works by reimbursing hospitals for their treatment of Medicare beneficiaries.   See 42 U. S. C. §1395ww(d).   To incentivize hospitals to treat patients in the most efficient manner, Congress reimburses hospitals for the services they provide at a fixed rate that turns on a patient's diagnosis rather than the hospital's actual costs. *Empire Health*, 597 U. S., at 429.

But Congress also recognized that some hospitals have it harder than others.   Based on empirical research, it specifically observed that "[h]ospitals that serve a disproportionate share of low-income patients have higher medicare costs," and that this was so for two primary reasons.   H. R. Rep. No. 99–241, pt. 1, at 16; see also *Empire Health*, 597 U. S., at 429.   First, low-income patients tend to be in poorer health to begin with, and have more complications after medical procedures than patients who are wealthier.   H. R. Rep. No. 99–241, pt. 1, at 16.   Second, hospitals that see a significant number of low-income patients often have to employ extra personnel, such as social workers and interpreters, in order to serve this population, adding to a hospital's fixed costs.   *Ibid.*

Congress thus reasonably decided that those hospitals that have a disproportionate share of low-income patients should receive enhanced Medicare reimbursements.   *Empire Health*, 597 U. S., at 429.   And, notably, by compensating for the disparity in treatment costs, Congress hoped to "encourag[e] hospitals to treat low-income patients."   *Ibid.*

To accomplish Congress's fair-reimbursement objectives, the hospitals with a disproportionate share of low-income pa-

tients first had to be identified.   One option would have been to require all hospitals to track their patients' incomes and report them to the Government.   H. R. Rep. No. 99–241, pt. 1, at 17.   But this would have added administrative overhead to already burdened hospitals.   *Ibid.*   So, instead, Congress devised a formula that could be used to calculate the percentage of a hospital's patients who are low income using administrative data already in the Government's possession.   See § 1395ww(d)(5)(F)(vi).

As the majority helpfully explains, part of that formula—referred to herein as the "Medicare fraction"—calculates the percentage of a hospital's Medicare-eligible patients who have low incomes.   The base of that fraction counts the total number of days Medicare patients spent in the hospital. *Ante*, at 8.   The numerator counts the number of days "'attributable to Medicare patients who are poor,'" as determined by their entitlement to SSI benefits.   *Ante*, at 7–8.

We took this case to decide who falls within the numerator. That is, *which* hospital patients are "entitled to [SSI] benefits" for purposes of the disproportionate-share formula? § 1395ww(d)(5)(F)(vi)(I).   This seems like a narrow, technical question.   But the stakes of the answer are quite high for hospitals because the greater the number of a hospital's patients who fall within the numerator, the more Medicare-reimbursement money that hospital will receive.

## II

The majority starts off on the right foot.   "To determine when a person is 'entitled to supplementary security income benefits,'" "we must know what the benefits are."   *Ante*, at 10 (quoting § 1395ww(d)(5)(F)(vi)(I)).   But it quickly missteps.   According to the majority, because SSI entitles individuals to "cash benefits," and the eligibility for those benefits "is determined on a monthly basis," *ante*, at 11, the Medicare fraction counts only those patients who are eligible for a cash payment under SSI during the month of their hospitaliza-

tion.    This conclusion misunderstands both the benefit that SSI provides and also, importantly, the reason *why* Congress used SSI as its proxy for identifying low-income patients.

### A

The regulations accompanying the SSI statute state that "[t]he basic purpose underlying the [SSI] program is to assure a minimum level of income for people who are age 65 or over, or who are blind or disabled and who do not have sufficient income and resources to maintain a standard of living at the established Federal minimum income level."    20 CFR § 416.110 (2024).    We have likewise explained elsewhere that "[t]he SSI program establishes a federally guaranteed minimum income for the aged, blind, and disabled."    *Schweiker* v. *Hogan*, 457 U. S. 569, 581–582 (1982).

At a high level, the SSI program works as follows.    Persons who are over 65, blind, or disabled may apply and will be enrolled in the SSI program if their annual income and financial resources are below a certain designated level.    42 U. S. C. §§ 1381, 1382(a)(1), (c)(7).    Once approved—and until that enrollment is terminated—an individual who is enrolled in the SSI program is guaranteed an annual income above the federal minimum.    See § 1382(b).    This does not necessarily mean such an enrollee will receive a check from the Government each month (or even at all)—that depends on other specified factors.    See § 1382(c).    But if in any month an enrollee's income drops below the rate required to hit the federal minimum, the Government will pick up the slack by sending them a check.    See *ibid.*

I pause here to note that participation in the SSI program is thus highly beneficial to enrollees, regardless of whether they happen to need and receive a check in any particular month.    This is so because being enrolled in SSI provides participants with meaningful reassurance.    Poverty in America is a plague of uncertainty marked by persistent instability—what others have called "the constant fear that it

will get even worse." M. Desmond, Poverty, By America 17 (2023). The problem is not just that one's income is too low; it is that one's income, such as it is, is highly volatile. "For scores of American workers, wages are . . . wobbly, fluctuating wildly not only year to year but month to month, even week to week." *Id*., at 16. As one woman living on the edge of poverty described her situation: "'[E]very day and every night when I'm trying to fall asleep, there's this worry hanging. . . . How am I gonna get it done? How am I gonna stretch to get these bills paid? If one extra thing happens—.'" D. Shipler, The Working Poor 25 (2004).

Congress understood this reality when it set out to construct an income-related social safety net for the population SSI covers. Indeed, the SSI program was specifically designed to address the often debilitating state of low-income volatility. If a person hovering at the poverty threshold is enrolled in the SSI program, she has peace of mind that if she misses work because her car breaks down, her child falls ill, or her work hours are suddenly slashed, she will still be able to pay the bills because the Government will provide her with some cash, if needed. *That* is the true "benefit" of SSI—one less thing to worry about.

This basic understanding of the SSI program also helps to clarify the beneficiaries (*i. e.*, it explains who is "entitled to" SSI benefits for purposes of that statutory scheme): anyone who, per the threshold statutory criteria, is protected by SSI's safety net in the first place. In other words, an "entitled" person is any individual who has a right to receive SSI payments when his income falls below the federal minimum.

The text and structure of the SSI statute plainly comport with this understanding of both the SSI benefit and what it means to be "entitled" thereto. The first substantive provision of the SSI subchapter—notably titled "Basic *entitlement* to benefits"—makes a promise: "Every aged, blind, or disabled individual who is determined . . . to be eligible on the basis of his income and resources shall, in accordance

with and subject to the provisions of this subchapter, be paid benefits." §1381a (emphasis added; boldface deleted). That is clear enough. But *which* individuals are "eligible on the basis of [their] income and resources"? That question is answered by the subsequent provision, §1382(a), which explains that any "aged, blind, or disabled individual" with an annual income and financial resources below a certain threshold "shall be an eligible individual for purposes of this subchapter."

Section 1382 then goes on to explain what an eligible individual is eligible for under this program. Subsection (b) guarantees each eligible individual payments from the Government up to the statutorily defined federal minimum income level over the course of a year, reduced by that individual's countable income for that year. §1382(b). And subsection (c) provides that eligible individuals will receive a cash payment in any month in which their monthly income falls below the amount that would be required for them to earn the federal minimum over the course of a year. §1382(c)(1).

Putting it all together: The SSI statute distinguishes between an entitlement *to be enrolled* in the SSI program—promised in §1381a with eligibility criteria laid out in §1382(a)—and the right *to receive a payment* under the program. Anyone who is in the former bucket gets the quite valuable safety-net benefit of being enrolled in SSI (and the peace of mind that comes with it), whether or not they actually receive a check from the Government in any particular month.

B

Because the majority fails to appreciate the programmatic nature of SSI, it reduces SSI's benefit to the monthly check—and nothing more. From that premise, the majority concludes that all Congress cared about when measuring a hospital's low-income population for purposes of Medicare's

disproportionate-share formula was the number of patients who received a check during the month of their hospital stay. But the majority also admits that the point of Medicare's disproportionate-share formula is to identify "'hospitals serving an "unusually high percentage of low-income patients."'" *Ante*, at 6. And whether an individual received a check from the Government in a given month does not track—and, indeed, has little to do with—the broader "low-income" category of patients. The result is an interpretation of the formula that not only strangely excludes indisputably low-income patients, but does so arbitrarily.

Imagine a woman who has been eligible for SSI payments for years and works at a retail store—I will call her Ann. In January, Ann picks up a few night shifts, which pay more than her usual day shifts. Cf. Shipler, The Working Poor, at 65. That extra income bumps her above the SSI cash-payment threshold so she does not get a payment in January. But in February (and March, and April, and May), when her schedule returns to normal, her income falls back below the threshold. In the majority's view, whether Ann counts as a low-income patient for purposes of the disproportionate-share formula depends on the happenstance of her hospitalization. If she has a heart attack in February, she's in. But if her heart fails in January, she's out.

*Why* would Congress have intended to exclude Ann from the hospital's count of low-income patients in January but include her in February? The answer is simple: It didn't. After all, the disproportionate-share formula is not about Ann's own personal cash flow—Congress was not trying to identify those patients who lack cash on hand. Instead, as all agree, the formula is trying to count those patients who will be costlier to treat due to the health impacts of poverty. From the hospital's (and society's) perspective, there is no cost difference between treating Ann in January (when she had a bit more cash) or treating her in February (when she

had a bit less). In either month, in terms of the hospital's comparatively greater treatment costs, Ann qualifies as a low-income patient.

The irrationality of the majority's reading does not end there. Under the majority's view, also falling outside the Medicare formula's numerator are patients who happen to be hospitalized during the first month they are eligible for SSI, because, by statute, SSI payments do not kick in until the second month of eligibility. See § 1382(c)(7). Other quirks of SSI's statutory scheme—such as a provision preventing persons in Medicaid-funded nursing homes from getting an SSI payment in any month in which they have more than $30 in income, § 1382(e)(1)(B)—likewise mean that many of the lowest income patients are arbitrarily excluded from the disproportionate-share formula's count. Neither of these circumstances has anything whatsoever to do with how costly it will be to provide such patients with quality healthcare.[1]

The majority does not mention these incongruities, let alone justify them. Instead, it shrugs away all of the apparent oddities of its interpretation, blithely noting that " 'no statute pursues a single policy at all costs.' " *Ante*, at 19 (brackets omitted). I would think the People's representatives deserve more credit than to have this Court conclude they intentionally enacted a statute that does not reach its aims and operates so arbitrarily that it makes no sense.

―――――――――

[1] The Government has at least conceded that its interpretation is not an "actual receipt" rule—a patient will be counted, the Government has promised, even if he doesn't *actually* receive an SSI payment in a given month (*e. g.*, because the enrollee moves or the post office loses the check), so long as he "satisfies the statutory requirements for a cash payment during the relevant month in question." Tr. of Oral Arg. 51. The Government also assured the Court that it would "retroactively" count patients who initially failed to receive a payment in a given month due to an administrative error (such as an erroneous address on file) that was subsequently cured. *Id.*, at 52.

In the majority's view, *my* way of analyzing the relevant statutes impermissibly elevates purpose over text, because it "overlooks that Congress chose a specific means to advance its end." *Ibid.* But that contention simply begs the question before us; what we are doing now is trying to discern what it was that Congress "chose" when it referenced the SSI program while crafting the Medicare fraction. The majority apparently believes it can figure that out without considering what the Medicare fraction was designed to accomplish—it just insists, largely by *ipse dixit*, that Congress "chose" a proxy for low-income status that asks whether a patient received an SSI check during the month of their hospital stay. *Ante*, at 12, 19. My response is simply, *why* would Congress possibly make *that* choice? The illogic of the majority's interpretation strongly signals that what the majority believes Congress "chose" is not actually what Congress intended or accomplished.

There is also no *need* to conclude that Congress intentionally selected such an irrational and arbitrary measurement when there is another equally (if not more) plausible interpretation available: that Congress intended to count those patients who were enrolled in the SSI program at the time the hospital served them. Statutes "are not inert exercises in literary composition," but "instruments of government." *United States* v. *Shirey*, 359 U. S. 255, 260 (1959). We disrespect that instrument—and the coequal branch of Government that has enacted it—when we fail to understand, or appreciate, the logic of the laws Congress designs.

C

There is yet another reason the majority's myopic approach to interpreting statutes has yielded the wrong result in this case. As the majority envisions the SSI program, a patient's entitlement to SSI toggles off and on each month, depending on her cash flow. That view of how the program operates is flatly inconsistent with the fully contextualized

reading that I have laid out in Part II–A. It also conflicts with the statute's plain text, which clearly contemplates an SSI entitlement that extends beyond a single month.

To understand how the majority goes awry on this point, start where the majority does: with the language of §1382(c)—a provision that explains *how* and *when* SSI cash benefits will be paid. See *ante*, at 11. By starting there, the majority essentially ignores §§1382(a) and (b), which plainly address *who* is entitled to SSI benefits and *what* they are qualified to receive due to that entitlement. See also *Schweiker* v. *Wilson*, 450 U. S. 221, 223, n. 2 (1981) ("To be eligible for SSI benefits," a person's "income and resources must be below the levels specified in . . . 42 U. S. C. §1382(a)"); *Sullivan* v. *Zebley*, 493 U. S. 521, 524 (1990) ("A person is eligible for SSI benefits if his income and financial resources are below a certain level, §1382(a), and if he is 'disabled' "). Moreover, and importantly for present purposes, subsection (a) eligibility looks to an individual's income over the course of a "calendar year"—not her income in any particular month. §1382(a)(1)(A). Thus, the text of this statute, read as a whole, plainly establishes that eligibility for SSI benefits operates on a longer time horizon than the majority acknowledges.

Other provisions further demonstrate that whether someone is "entitled to" SSI benefits does not turn on their income in a single month. After an individual applies for SSI and is deemed eligible under §1382(a), she need not apply again the next month—or, actually, any month thereafter—because her eligibility for benefits lasts until her income is too high for one full year, §1383(j)(1); 20 CFR §416.1335, or until her enrollment is terminated for some other reason, §1383(e)(1)(A); 20 CFR §§416.1331, 416.1333–416.1334. The statute also seems to contemplate a long-term benefits relationship, insofar as it permits the Department of Health and Human Services (HHS) in certain circumstances to "*defer* (in the case of initial entitlement) or *suspend* (in the case of

existing entitlement)" SSI benefits—a distinction that only makes sense if an individual's entitlement to SSI lasts beyond a single month. §1383(a)(2)(B)(viii) (emphasis added); see also §1382c(a)(3)(H)(ii)(I) (referring to an individual's "continued eligibility" for benefits over the course of multiple years).

If all that is still not enough to permit the majority to accurately discern the broader confines of this program, consider the fact that HHS requires SSI applicants to grant the agency permission to access their financial records so that HHS can automatically monitor their income. §1383(e)(1)(B)(ii); 20 CFR §416.207. That authorization lasts until "the cessation of the recipient's eligibility for benefits under this subchapter." §1383(e)(1)(B)(ii)(II)(bb). But if eligibility for SSI benefits were a monthly determination, the give-us-your-records provision would accomplish nothing. It would do the agency no good to have permission to access those records for one month and one month only.

The practical realities of SSI administration further demonstrate that the SSI entitlement is not determined month by month. For example, SSI benefits are paid on the first day of the month—an individual receives his February payment on February 1st. 20 CFR §416.502. With its month-only entitlement perspective, the majority thus apparently surmises that HHS regularly pays benefits without knowing whether the recipient is eligible for SSI at all. Any such policy would be surprisingly irresponsible. But if SSI is a program that lasts beyond a single month, day-one payments are both rational and administratively feasible. Recall that we are talking about people who are desperately in need of cash to pay their monthly bills; this explains the agency's practice of providing prompt, prospective payments, which the aforementioned income monitoring facilitates. Moreover, as I have explained, once an individual is approved for SSI, he is entitled to receive such prospective payments, as needed, until his enrollment is terminated. By adopting a

broader time horizon than the single month in which the payment is made, the agency can get the money out to the needy individual and then subsequently smooth out any over- (or under-) payments it makes, by checking the person's actual salary for the month in question and, if necessary, adjusting the amount it pays in later months.   See § 1383(b).

The majority simply ignores these kinds of programmatic features that cut against its reading.   And the unhelpful statutory provisions that the majority does acknowledge get short shrift in its opinion; in a footnote, the majority bats them away as mere legislative "housekeeping."   *Ante*, at 16, n. 5.   I grant that it is easier to duck Congress's handiwork than to explain the implications of its various policy choices. But if the majority is going to base its interpretation exclusively on what Congress "chose" when it used the term "eligibility," it must grapple with *all* such usages of that term in the statute in question—not just those that support its preferred reading.[2]

Notably, the design of the statute that creates the SSI program—basic criteria establishing an entitlement to a benefit, pursuant to which individuals are eligible for a payment under certain conditions that are delineated elsewhere—is not unique to SSI.   Consider veterans benefits, for example. A veteran "with the requisite period of military service becomes '*entitled to*'" certain educational benefits, "typically in the form of a stipend or tuition payments."   *Rudisill* v. *McDonough*, 601 U. S. 294, 299 (2024) (emphasis added). But just because a person is entitled to those benefits does not mean she will ever receive them; there are hoops through which she must jump and conditions she must satisfy to be eligible to receive a payment.   *Id.*, at 300–301.

--------

[2] For my part, I do not deny that the SSI statute discusses an individual's "'eligibility for a benefit . . . for a month.'"   *Ante*, at 11 (quoting § 1382(c)(1)).   But, as I've explained, that monthly eligibility is meant only to describe the benefit (*i. e.*, the cash payment) that an individual who is entitled to SSI is eligible to receive.   *Supra*, at 26.

Or consider Medicare Part A. "When a person turns 65," she "becomes 'entitled' to" Medicare Part A benefits. *Empire Health*, 597 U. S., at 428 (quoting 42 U. S. C. §§ 426(a)–(b)). There, too, entitlement does not guarantee payment—a person may be entitled to Medicare Part A benefits yet never receive a single cent, perhaps because he is covered by private health insurance, or because he has hit some statutory cap on care. 597 U. S., at 432. As this Court has recognized, "[t]he entitlement to [Medicare Part A] benefits" is simply "an entitlement to *payment under specified conditions*." *Id.*, at 436 (some emphasis deleted). The same is true of SSI. Compare § 426(c)(1) (explaining that "entitlement of an individual" to Medicare Part A benefits "consist[s] of entitlement to have payment made under, and subject to the limitations in, part A") with § 1381a (stating that "[b]asic entitlement to [SSI] benefits" consists of a promise to certain individuals of payment "in accordance with and subject to the provisions of th[e SSI] subchapter" (boldface deleted)).

Page Proof Pending Publication

## III

It was precisely this distinction—between a threshold entitlement to participate in a benefit program, on the one hand, and a subsequent right to a payment under that program, on the other—that was the linchpin of our interpretation of another part of the disproportionate-share formula just three Terms ago. In *Empire Health*, we faced a question that is substantially similar to the one the Court decides today: Which patients are "'entitled to'" Medicare Part A benefits for purposes of the disproportionate-share formula? 597 U. S., at 428. What is more, the arguments in that case mirrored the arguments we consider now. One side maintained that a patient is "entitled to" such benefits only if she had actually received a Medicare payment; the other insisted that a patient is so entitled if he was eligible for the Medicare Part A program, no payment necessary. See *id.*, at 432–433. Notably, however, the valence of the arguments was

flipped—in *Empire Health*, it was the hospitals that insisted payment was required, while the Government asserted program eligibility sufficed. *Ibid.*

We sided with the Government. A patient is "'entitled to'" Medicare Part A benefits, we held, if she "meet[s] the basic statutory criteria" for the Medicare Part A program, whether or not she "actually receiv[ed] payment for a given day's treatment." *Id.*, at 435. For purposes of the disproportionate-share formula, we said, a patient's receipt of payment is beside the point. All the formula cares about is whether a patient qualifies for the program that entitles her to payment under specified conditions. *Id.*, at 436.

Exactly that same logic should have carried the day here. A patient is "entitled to" SSI benefits for purposes of the disproportionate-share formula if she "meets the basic statutory criteria" for the SSI program, whether or not she "actually receiv[ed an SSI] payment" in the relevant month. *Id.*, at 432, 435. In other words, just as with Medicare Part A, statutory entitlement to SSI "coexists with limitations on payment." *Id.*, at 436.

Our reasoning in *Empire Health* resulted in hospitals receiving less money by operation of the Medicare fraction. *Id.*, at 444. Applied here, that same logic requires them to receive more, because it places more patients in the numerator of the Medicare fraction. But instead of simply following *Empire Health* where it leads, the majority diverges from its clear and plainly applicable holding. In the majority's view, although a patient need not receive a Medicare Part A payment to be "entitled to" Medicare Part A for purposes of the disproportionate-share formula, she must receive an SSI payment to be "entitled to" SSI under that same calculation.

To justify this puzzling departure, the majority identifies two "critical distinctions" that it says distinguish SSI from Medicare Part A and thus make this case different from *Empire Health*. *Ante*, at 18. First, the majority says that

Medicare Part A benefits "extend beyond specific payments for any given medical need," whereas SSI benefits "consist of monthly cash payments and nothing more." *Ibid.* I've already explained why that characterization of SSI is wrong: The SSI benefit is not simply the payment itself, but the *promise* of a payment in one's time of need. *Supra*, at 24–25. SSI thus operates just like income insurance. Enrolled individuals are promised a payout, should the relevant triggering event—monthly income below the threshold—occur.

The majority rejects this commonsense conclusion based on superficial mischaracterizations of the SSI program and what it means to the people who rely on it. So, SSI is commonly described as a "'welfare program,'" *ante*, at 16—so what? That label does not change the fact that *this* welfare program operates more like insurance than a subsidy. The majority also seems to believe that insurance programs may protect beneficiaries only against increased *costs*—not decreased *income*. *Ibid.* But why is *that* the case? Economically speaking, increased costs and decreased income are two sides of the same coin. The only difference is the precipitating factor, and, of course, the fact that the decreased-income species of insurance acknowledges the reality of income insecurity.

The second declared distinction is the majority's contention that Medicare Part A is "automatic and ongoing" while SSI is not. *Ante*, at 18. This seems faulty from the start, since the majority concedes that disabled individuals can lose their entitlement to Medicare Part A if their disability diminishes. *Ibid.* Thus, it is questionable whether Medicare Part A is, in fact, "ongoing." In any event, the majority fails to explain why this "ongoing" distinction makes any difference. The question before us is whether a person is "entitled to" SSI for purposes of the disproportionate-share formula, not whether a person must reapply to become so entitled, or whether it is possible to be excised from this benefit program's rolls.

Ultimately, then, neither of the "critical" distinctions that the majority identifies between Medicare Part A and SSI are critical at all.   So, in the absence of any principled basis for distinguishing this case from *Empire Health*, the majority falls back on pithy rhetoric, quipping that "'it makes little sense to say that individuals are "entitled" to the benefit in months when they are not even eligible for it.'"   *Ante*, at 16. Again, this characterization misrepresents the real benefit of SSI.   It is also noteworthy that, while some on this Court embraced a similar argument in *Empire Health*, they did so in dissent.   See 597 U. S., at 447–448 (opinion of KAVA- NAUGH, J.) (arguing that a patient could not be considered "entitled to" a Medicare Part A benefit "if the patient by statute could not" receive a payment).   The majority view in *Empire Health* fully appreciated the insurance-like nature of the Medicare program, and its reasoning applies full bore to the question we address today.

*      *      *

The decision the majority has made in this case will de- prive hospitals serving the neediest among us of critical fed- eral funds that Congress plainly attempted to provide.   Hos- pitals that have a disproportionate share of low-income patients are struggling.   Indeed, it is undisputed that sys- temically undercounting low-income patients for the pur- poses of the disproportionate-share formula might cause many such hospitals to close their doors entirely, such that patients from our Nation's poorest communities may not be served at all.   Brief for American Hospital Association et al. as *Amici Curiae* 27–28; Tr. of Oral Arg. 36–38.

This outcome is not compelled by the text of the Medicare statute or the circumstances that surround it.   Rather, it is, unfortunately, directly attributable to the majority's incuri- ous and context-free method of statutory analysis.   Con- gress's reference to the SSI program in the Medicare formula has confused the majority into thinking that Congress meant

Jackson, J., dissenting

for hospitals serving low-income patients to be reimbursed at lower rates than if their patient population was fully taken into account. So it will now be up to Congress to restate its intention that low-income people have access to quality medical care and that hospitals be compensated accordingly.

I suspect that such a legislative fix would not be too difficult to craft. But Congress would not need to go that extra mile if this Court's interpretive practices would just take care to evaluate the text of a statute alongside any indisputable legislative objectives. Here, we should have easily concluded that, for purposes of the disproportionate-share formula used to reimburse hospitals, patients are "entitled to" SSI benefits when they are eligible for and enrolled in the SSI program, as Congress undoubtedly intended.

Page Proof Pending Publication

Page Proof Pending Publication

REPORTER'S NOTE

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

p. 2, line 1: "faction" is inserted before "Medicare"